IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PARADISE RIDGE DEFENSE COALITION, INC., | No. 1:16-cv-374-BLW |
| Plaintiff, | |
| v. | **MEMORANDUM DECISION AND ORDER** |
| PETER J. HARTMAN, Division Administrator for the Idaho Division of the Federal Highway Administration; The FEDERAL HIGHWAY ADMINISTRATION; and The IDAHO TRANSPORTATION DEPARTMENT, | |
| Defendants. | |

## INTRODUCTION

The Court has before it motions for summary judgment filed by the three parties in this case:  The plaintiff Paradise Ridge Defense Coalition, and defendants Federal Highway Administration (FHWA) and Idaho Transportation Department (ITD).  The Court heard oral argument on July 24, 2017, and took the motions under advisement.  For the reasons expressed below, the Court will deny plaintiff's motion and grant defendants' motions.

## BACKGROUND OF LITIGATION

Plaintiffs challenge a highway project just south of Moscow, Idaho designed to improve a stretch of US-95.  This highway connects Lewiston and Moscow, running for about 22 miles between these cities.  The project will involve moving a portion of US-95 closer to Paradise Ridge, which contains some of the best remaining examples of the

Palouse Prairie ecosystem, along with stands of pine trees and grasslands.  Plaintiff claims that the choice of this alternative violates NEPA, an Executive Order, and agency regulations.  Plaintiff seeks to enjoin any further work on the US-95 project until the agencies comply with NEPA.

In 1999, the FHWA and the ITD began making plans to improve US-95 between Lewiston and Moscow.  At that time the highway was narrow and dangerous, often derided as a "goat trail."  The agencies planned to widen about 15 miles of the road and construct a new highway over about 5 miles.  They completed an Environmental Assessment and a Finding of No Significant Impact, that was challenged in 2003 by plaintiff.  The agencies had selected an alternative that constructed a new highway near the base of Paradise Ridge.  Plaintiff challenged that decision on the ground that it had significant environmental impacts that needed to be studied in an Environmental Impact Statement (EIS).  This Court agreed, and enjoined further construction until the agencies conducted their EIS.  *See Memorandum Decision (Dkt. No. 44) in Paradise Ridge v FHWA 3:03-cv-156-BLW.*

After some delay, the agencies completed their EIS and ROD, settling on a project that would replace the existing two-lane undivided highway from Thorncreek Road to the South Fork Palouse River Bridge with a four-lane highway divided by a 34-foot median through most of that alignment.  The highway would transition to a four-lane highway with a center turn lane in the urban area just south of Moscow.

The preferred route – and the route chosen by the ROD – had been labeled as the E-2 alternative.  The ROD rejected two alternative routes labeled C-3 and W-4 and the no-action alternative.

Of all these alternative routes, the E-2 route takes the highway closest to Paradise Ridge, home to several remnants of the Palouse Prairie ecosystem.  That ecosystem is characterized by native grasses and flowers, and is excellent habitat for a wide variety of wildlife.  Because about 99% of the Palouse Prairie has been converted to agricultural lands, it is considered one of the most endangered ecosystems in the United States.  *AR 000645.*  Paradise Ridge is entirely privately owned, and consists of rural residential developments, commercial developments, actively farmed land, and Conservation Reserve Program land (where farmers remove lands from agricultural production in exchange for rental payments, and plant alternative vegetation to improve water quality and prevent soil erosion).  *AR 000616*

In selecting the E-2 alternative, the ROD, issued in March of 2016, gave the following explanation:

> The FHWA and ITD selected the E-2 Alternative which was the Preferred Alternative in the FEIS. The primary advantages of the E-2 Alternative are that it is aligned through flatter topography, has the fewest US-95 access points, and has the greatest safety improvement. E-2 will affect the least amount of tributary channel distance and will avoid floodplains. Similarly to the other alternatives, it will avoid cultural and Section 4(f) resources. The primary disadvantage of E-2 over the other alternatives is that it will be located closer to Paradise Ridge, which supports a Ponderosa pine stand and various shrubs that provide the best ungulate habitat in the project area (Sawyer 2010). The affected pine stand is pygmy nuthatch habitat and potential habitat for long-eared myotis and northern alligator lizard. It will impact the greatest number of wetlands and the highest quality wetlands (i.e. scrub-shrub) and headwater

tributaries. The E-2 Alternative will have the greatest indirect effects to Palouse remnants, planned and ongoing Palouse restoration projects and a key conservation area for Spalding's catchfly recovery primarily due to potential weed establishment and spread outside the right-of-way compared to the other alternatives. Although E-2 will have the highest noise impacts to residences of the action alternatives, E-2 is compatible with land use plans.   The evaluation of effects during the screening process, detailed analyses presented in the DEIS and FEIS, and the public and agency comments on the DEIS and FEIS resulted in the lead agencies, FHWA and ITD, selecting the E-2 Alternative. The E-2 Alternative was selected for the following reasons:

- It will have the greatest safety improvement.
- It will have the fewest access points and at-grade county intersections.
- It will have the least effect to streams.
- It will avoid potential business impacts and floodplains.
- It will have the shortest five-lane typical section and overall shortest length.
- It meets the project purpose and need.

*AR 000035.*  Plaintiff Paradise Ridge challenges the selection of the E-2 Alternative, arguing that it has the worst impact of all the Alternatives on Paradise Ridge and the Palouse Prairie ecosystem.  The Court will address plaintiff's arguments after reviewing the applicable legal standards.

## LEGAL STANDARDS

Judicial review of final agency decisions under NEPA is governed by the Administrative Procedures Act ("APA").  *Native Ecosystems Council v. U.S. Forest Service,* 866 F. Supp. 2d 1209(D. Idaho 2012).  Under the APA, the court shall set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A).  An agency action should be overturned when the agency has "relied on factors which Congress has not intended it to consider,

entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463U.S. 29, 43 (1983).

## ANALYSIS

### Range of Alternatives

Plaintiffs argue that the defendants arbitrarily selected the three alternatives for in-depth review, eliminating other alternatives that were rated higher.  NEPA requires agencies to "rigorously explore and objectively evaluate all reasonable alternatives" to a proposed plan of action that has significant environmental effects.  *See* 40 C.F.R. § 1502.14(a).  This is "the heart" of an EIS.  *City of Carmel-by-the-Sea v. United States Dep't of Transp.,* 123 F.3d 1142, 1155 (9th Cir.1997).

Here, after a lengthy study and public input process, the agencies identified ten Action Alternatives in the western, central, and eastern corridors. *AR 00586.*  Each shared the same design criteria: a combination of four-lane undivided highway and four-lane highway with a center turn lane.  *AR 000581.* The ten alternatives were then screened based on 23 criteria including air quality, water quality, safety, weather, etc.  *AR 000584.*  Each alternative was given a numerical score based on the number of positive attributes it received in the screening process.  *AR 018881.*  As a rule, the least amount of impact of any environmental factor was considered favorable.  *Id.*  In situations where

alignment information for a given environmental factor was equal, all the alignments were counted as favorable.  *Id.*

For example, the highest rated alternative (C-3) received 13 positive attributes, including top marks for, among other criteria, (1) ice conditions; (2) historic site impacts, (3) wetland impacts; (4) total construction cost, and (5) visual analysis.  The other high-ranking alternatives, C-1, C-2 and W-2 received 11, 10, and 10 positive attributes respectively.

The E-2 alternative, by way of comparison, received only 7 positive attributes, placing it in a tie with E-3 and just ahead of the last-place finisher, E-1, which received 6 positive attributes.

In selecting the alternatives to study in-depth, the ITD did not choose the top ranked alternatives (which would have been C-1, C-2, C-3 & W-2), but instead chose one alternative from each corridor.  Because E-2 was highly ranked within the eastern corridor, it was chosen to be one of the three alternatives to be studied in the FEIS.  *AR 000587-88.*  The ITD used this selection process "[b]ased on a desire to maintain corridor and alignment options and based on extensive environmental evaluation and public involvement."  *AR 018903.*

The selection of each alternative within each corridor was described in the FEIS.  For example, the FEIS discussed the three alternatives in the eastern corridor as follows:

The E-2 Alternative was forwarded for further consideration because it had the least effect to wetlands, cultural resources and was the only alternative to not directly affect rare plant communities. The E-3 Alternative effects were very similar to the E-2 Alternative but E-3 resulted in three more residential impacts and twice as many business impacts than E-2. While the residential and business impact assumptions and numbers have been modified since the screening report was prepared, the E-2 Alternative still resulted in overall less impact. The E-3 Alternative directly affected two rare plant communities and resulted in slightly higher effects to prime farmlands compared to E-2. While the differences were small they were higher and more adverse. The E-2 Alternative was forwarded for detailed analysis because it had the least overall effects compared to the other alternatives in the eastern corridor.

*AR 000587-88.* The other two corridors – the western and central corridors –

went through a similar analysis in the FEIS.

This Court reviews an EIS's choice of alternatives under the "rule of

reason." *Westlands Water Dist. v. U.S.,* 376 F.3d 853, 868 (9th Cir. 2004).

Under the rule of reason, the EIS "need not consider an infinite range of

alternatives, only reasonable or feasible ones." *Id.* "Nor is an agency required to

undertake a separate analysis of alternatives which are not significantly

distinguishable from alternatives actually considered, or which have

substantially similar consequences." *Id. (quoting Headwaters, Inc. v. BLM*, 914

F.2d 1174, 1181 (9th Cir.1990)).

Plaintiff argues that by selecting one alternative from each corridor, the

agencies ignored top-ranked alternatives C-1, C-2 and W-2, and arbitrarily

elevated one of the lowest ranked alternatives, E-2, up beside the highest ranked

alternative, C-3. But when the scoresheet is examined in detail, the differences

between these alternatives is narrow. *AR 18881.* For example, E-2 ranked

higher than C-2 and C-3 on criteria of noise, length of roadway, and impacts to tributaries, floodplains, and archeological sites.  *Id.*  The E-2 route would encounter only half the hazardous material sites as C-3, and the same number of sites as C-1, C-2, and W-2.  *Id.*  With regard to conditions like fog, rain, and ice on the road – all important safety factors – E-2 and C-3 received the same ranking.  *Id.*  The impacts on rare plants and threatened/endangered species was judged to be the same for E-2, C-1, C-2, C-3, and W-2.  *Id.*  While C-3 would displace 3 residences, E-2 would displace 5 – not a large difference.

Given this, the Court cannot find that the differences between the top four alternatives and E-2 were so significant that it was arbitrary and capricious – and a violation of the rule of reason – for the agencies to choose E-2 as one of the alternatives to study in-depth.

## Wetlands

Plaintiffs argue that the FHWA was required to select the alternative with the least impact on wetlands, and was arbitrary and capricious in selecting E-2, the alternative with the greatest impact on wetlands.  Under an Executive Order issued by President Carter, federal agencies are to avoid new construction in wetlands unless: (1) there is "no practicable alternative" to the construction, and (2) the federal action includes "all practicable measures to minimize harm to wetlands."  *See* EO11990 § 2(a), 42 Fed. Reg. 26,961 (May 24, 1977).  In evaluating "practicable" alternatives, the agency may balance various factors including "economic, environmental and other pertinent factors."  *Id*.  The term "practicable" in this context means "whether it is capable of attainment within

relevant, existing constraints." *Nat'l Wildlife Fed'n v. Adams*, 629 F.2d 587, 592 (9th Cir. 1980). An agency is not required to select the alternative with the least impact to wetlands. *See, e.g., City of Dania Beach v. F.A.A.*, 628 F.3d 581, 591 (D.C. Cir. 2011) (holding that even if another alternative would cause no impacts to wetlands, agency's decision not to choose it was not arbitrary and capricious).

Here, the FEIS and ROD were based on extensive wetland studies. *AR 018782, 784, 790-804 (2005 Report); AR 017927, 30, 32-50 (2012 Report).* Based on these studies, the FEIS concluded that W-4 would impact 1.85 acres of wetlands, C-3 would impact .99 acres, and E-2 would impact 3.61 acres. The FEIS acknowledged that C-3 had the least impact, and E-2 had the greatest impact. *AR 000715.*

As discussed above, however, the agency is authorized to balance economic, environmental, and other factors. The FHWA conducted that balancing analysis, finding that E-2 would not affect floodplains, would not affect ungulate populations, and would have the least impact to streams. *AR 000599, FEIS Table 8, AR 000596-97.* The E-2 Alternative would also result in the shortest travel time and lowest user cost. *AR 000599.*

FHWA also used mitigation credits from other areas within the same watershed. *AR 000716.* Specifically, the agency used credits from the Cow Creek Mitigation Area pursuant to the compensatory mitigation process set forth in 33 CFR Part 332. *Id.*

The Court finds that the defendants properly followed the dictates of the Executive Order on wetlands, and that the FEIS and ROD cannot be deemed arbitrary and capricious for their treatment of wetlands.

**Crash Data**

Plaintiffs argue that the ROD relied on unreliable predictions about future car crashes in reaching its decision to choose the E-2 alternative. Evaluation of this argument requires answering three questions: (1) How did the defendants predict future car crashes on the alternative routes? (2) How accurate are those predictions? and (3) What role did those predictions play in the decision to choose the E-2 alternative?

Defendants used a predictive model found in the Highway Safety Manual (HSM) published by the American Association of State Highway and Transportation Officials (AASHTO). There is no dispute that the HSM sets forth the industry standards for highway safety. The predictive models in the HSM consist of three basic elements: safety performance functions, crash modification factors, and a calibration factor. *AR 0340320.*

To predict future crashes on a particular segment of roadway, the engineer begins with "safety performance functions" or SPFs for short. SPFs are regression models for estimating the predicted average crash frequency on individual roadway segments or intersections. *AR 034313.* They are primarily based on the annual daily traffic (AADT) volume for that particular segment of road. *AR 34303.*

But the SPFs do not take into account the unique variations in the particular road segment under review by the engineer. For example, reducing lane separation along this segment might increase crashes while reducing intersections might reduce crashes. While the SPFs do not take into account these unique variations, the predictive model has a second step that does account for them, by using "crash modification factors" or CMFs

for short.  *AR 034313-14.*  Once the SPF is calculated, the engineer can then see how the

crash prediction is changed by, say, widening lane separation or reducing intersections.

Therefore, a CMF represents the relative change in estimated average crash frequency

due to a change in one specific condition (when all other conditions and site

characteristics remain constant).  *Id.*  Finally, the engineer can use the HSM's calibration

factors to align his predictions with local conditions.  *Id.*

Using this predictive model, the State's Safety Analysis predicted the number of

crashes that would occur during the year of completion of the road project for each of the

three alternatives as follows:

- No action:    11
- E-2            4.4
- C-3            4.7
- W-4            5.1

*AR 015448.*  To obtain a longer-term analysis, the Analysis multiplied these figures by 20

to predict the total crashes over a two-decade period, and arrived at these estimates:

- No action:    642.5
- E-2            213.9
- C-3            260.2
- W-4            246.2

*Id.*  The variation in these numbers was due to differences in "the length of the rural

section, length of the suburban section, and the number of county road approaches that

intersect a proposed alternative."  *AR 015434.*

But are the differences significant?  No predictive model is perfect, and every

result has a margin of error.  Identifying that margin is key to determining whether the

**Memorandum Decision & Order – page 11**

differences mean anything.  The "margin of error" is also known as confidence intervals. The State's Safety Analysis observes that "[c]onfidence intervals cannot be calculated for each of the proposed alternatives because some of the Crash Modification Factors do not have published standard deviation."  *AR 015434.*

Without confidence intervals, it is impossible to tell whether, say, E-2 (with 4.4 projected crashes) is safer than C-3 (with 4.7 projected crashes).  In this example, there is a mere .3 difference in projected crashes, and even a slight margin of error might change the comparison.[1]  That is why a comparison of projected numbers must be accompanied by a confidence interval.

But suppose the user is not just making a rank comparison using the projected crash numbers but is instead going behind the numbers to identify the causes of crashes. For example, the CMF process shows that adding intersections or reducing lane separation will increase accidents, and conversely, reducing intersections and increasing lane separation will decrease accidents.  Plaintiff does not explain why confidence intervals would be necessary to detect trends in this manner and make comparisons based on those trends.  Plaintiff would need expert testimony to challenge HSM's conclusion that, for example, an increase in intersections will result in an increase in crashes or that a reduction in lane separation will cause an increase in crashes.  Plaintiff provides no such expert testimony.

---

[1] In addition to this problem with a lack of confidence intervals, it is simply fallacious to make a broad finding about safety from such a miniscule difference.  This point was made by an engineer with the FHWA when he commented on a draft EIS: "Accident data reported to the hundredths per year is very suspect . . . ."  *AR 033312.*

Thus, it is crucial to determine whether the HSM user – in this case the FHWA and ITD – relied on a rank comparison of projected crash numbers or instead relied on the HSM factors to rank alternatives based on engineering judgment.

The ITD's Safety Analysis does fall into the trap of making a rank comparison of projected crashes when it concludes that E-2 "is the recommended alternative based on safety *because it has the lowest predicted crash rate. AR-015449 (emphasis added).* But it also relied on engineering judgment when it explained that the "reason it has the lowest predicted crash rate is because it is the shortest alternative, has the fewest public road intersections, and has the fewest approaches." *Id.*

But it is in the ROD where the FHWA makes the final decision to proceed with the E-2 alternative. The ROD relies on engineering judgment by concluding that E-2 had the "greatest safety improvement" because it had the "fewest access points and at-grade county intersections," the "shortest overall length," and the "shortest five-lane typical section." *AR 000035.* The ROD did not, however, ignore entirely the projected crash rates – the ROD noted that E-2 has the shortest five-lane section, making it safer because "the five-lane section has approximately three times more predicted crashes than the divided four-lane rural section." *AR 000036.* However, the ROD noted that this was only part of the analysis because "other factors also contribute to the differences in safety including intersections and approaches. The E-2 Alternative will have the fewest county road intersections and the fewest residential and commercial approaches." *Id.*

A fair reading of the ROD shows that it relied on engineering judgment and the trends in crash projections, rather than relying on a rank comparison of projected crash

numbers.  The HSM itself directs users to rely on "sound engineering judgment."  *AR 033937*.  Thus, the Court cannot find the ROD to be arbitrary and capricious based on plaintiff's statistical objections.

## Wildlife Collisions

Plaintiffs argues that the FEIS failed to adequately address the safety risks that wildlife will pose to the E-2 alternative.  Plaintiffs point out that Paradise Ridge contains a "thriving population of large game, such as deer, elk, and moose. Predictably, moving the highway alignment closer to Paradise Ridge (as the E-2 Alternative would) substantially raises the likelihood of vehicle collisions with wildlife."  *See Plaintiffs' Brief (Dkt. No. 42)* at p. 17.  The same comment was made by the Idaho Department of Fish and Game ("IDFG") in its review of the DEIS:

> All of the wildlife, assessment reports (Melquist Ruediger, IDFG and Sawyer) concur that moving to the E-2 alignment is likely to have the highest risk of wildlife collisions of the three alternatives considered because of proximity to the best habitat. What is not acknowledged or discussed in the DEIS is that the likelihood of wildlife collisions also increases as speed limits are increased and as the footprint of the highway is expanded.

*AR 00916*.  Despite these concerns, the increased likelihood of animal/vehicle collisions did not factor into the projected crash rates for the E-2 Alternative.  The traffic safety analysis acknowledges "no factors increasing the number of wild animal crashes were applied to the crash predictions on Alternative E2."  *AR 15440*.  The State's Safety Analysis treats each alternative as if it faced the same risks of animal collisions, despite

**Memorandum Decision & Order – page 14**

acknowledgment that "Alternative E2 may have greater wild animal crash potential than Alternatives C3 and W4 . . ." *AR 15440.*

There is, however, substantial evidence that the risk of wildlife collisions will be low. Three wildlife experts all agree that while E-2 would likely have the most collisions, even the number for E-2 will be low. *See e.g., AR 016131* (Ruediger: collisions on E-2 will be at "relatively low levels"); *AR 016207, AR016228* (Melquist: number of collisions less in areas with poor habitat; more collisions expected in E-2 corridor but habitat is low quality); *AR 016120* (Sawyer: E-2 has highest potential collisions relative to the other alternatives but the risk is low).

The Safety Analysis discusses "wild animal crashes." *AR 015435-40.* On the current road alignment, there were seventeen crashes over ten years. *AR 015436.* The risk of collision will decrease on all alignments based on AASHTO compliance and the HSM predicts some wildlife collisions within its base formulas. *Id.; see also AR 003394; Table 10-4, AR034338.* The ITD's Safety Analysis does acknowledge that the wildlife reports indicate that E-2 will have more potential for animal/vehicle collisions that the other Action Alternatives. *AR 015436.* However, design features such as increased sightlines (due to a more rolling topography), and clearing roadside vegetation, are expected to minimize potential collisions. *AR 015436-37.* As a result, the Safety Analysis concludes that animal/vehicle collisions "should not be a dominant factor in selecting an alternative." *AR 015440.*

The ROD explains that animal/vehicle collisions were considered and it discusses mitigation and monitoring. *AR 000024-25.* The issue of animal/vehicle collisions and

potential ways to reduce them is discussed in Section 7.1.1 of the ROD.  A combination

of the items discussed in the Safety Analysis are included in the ROD's mitigation

measures.  *AR 000038-39 (fencing, underpasses, sensors, roadside clearing).*

The agency took the required hard look at the environmental impacts of potential

wildlife collisions.  The Court cannot find that this analysis violates NEPA or is arbitrary

in its conclusions.

## Consultation With Headquarters

Plaintiffs argue that the FHWA's Idaho Division Office failed to obtain "prior

concurrence" from FHWA's headquarters as required by its own regulations when

another agency – in this case the EPA – indicates opposition on environmental grounds.

*See* 23 C.F.R. § 771.125(c)(2).  Under past practice, the FHWA Headquarters reviewed

all ESIs, but in 1987 the agency changed its policy to streamline the review process by

delegating decisions to the field offices.  *See* 52 Fed.Reg. 32646, 32,655 (Aug. 28, 1987).

Since the regulation became effective, the FHWA has issued "Guidance on FHWA Prior

Concurrence Procedures for EISs."[2]  The Guidance explains that while in the past about

"half of the EIS projects required prior concurrence," currently about "ten percent of EIS

projects require prior concurrence."  The Guidance goes on to describe the factors that

"can be considered" for concurrence:

> This is decided on a case-by-case basis, but projects with one or more of
> the following characteristics can be considered to be potential candidates:
> •        Impacts of unusual magnitude;

---

[2] The Guidance document can be found on the FHWA website at the following
address:  *https://www.environment.fhwa.dot.gov/guidebook/pcguidance.asp#2.*

**Memorandum Decision & Order – page 16**

- High levels of controversy;
- Emerging or national policy issues under development;
- Issues for which the Division office seeks policy assistance.

Some examples of the above characteristics could be: the threat of a project's referral to the Council on Environmental Quality; the failure to resolve issues involving Federal environmental responsibilities; major disagreements with resource agencies, including the possibility of an adverse rating (e.g., "Environmentally Unsatisfactory\EU" or "Inadequate Statement\3"); or the active involvement of high-profile participants, such as members of Congress or national environmental organizations.

The focus of prior concurrence should be the need for a HQ policy perspective, rather than routine technical assistance which Divisions can obtain from the Resource Centers without a HQ prior concurrence role.

In the present case, the EPA reviewed the draft EIS and notified the FHWA and ITD that it had "serious concerns regarding the preferred alignment, due to anticipated significant environmental degradation of aquatic resources, and Palouse prairie habitat and species that could be corrected by project modification or selection of another alternative." *AR 000892*. EPA rated the DEIS as "EO-2, Environmental Objections, Insufficient Information." *AR 00891*. This rating means that the "EPA review has identified significant environmental impacts that should be avoided in order to provide adequate protection for the environment." *AR 00904*. EPA also rated the DEIS as "Category 2 – Insufficient Information," which means "[t]he draft EIS does not contain sufficient information for EPA to fully assess environmental impacts that should be avoided in order to fully protect the environment . . ." *Id.*

The FHWA Division Office pursuing this project did not feel that the EPA's objection warranted a concurrence with Headquarters. The head of the Division Office, Brent Inghram, wrote an email to Owen Lindauer at FHWA Headquarters in early December of 2014, explaining that,

although some agencies concur with the preferred alternative identified in the (administrative draft) FEIS for this project, other agencies (including EPA and USFWS) do not.  These agencies are not opposed to the project per se, they just do not concur with which alternative was identified as the preferred alternative.   EPA reviewed the DEIS and rated it EO/II (environmental objections/insufficient information).  There are no issues outstanding for which the Idaho Division requires HQ assistance to resolve or on which policy matters need to be addressed.  Given all this, we agreed that review and prior concurrence by Headquarters is not necessary for the [project]."

*AR 033215.*  Later that same day, Lindauer responded that "I agree with your summary and conclusion that the [project] FEIS need not be subject to a prior concurrence review" because "none of the project impacts rise to the level as mentioned in regulation that might trigger any consideration of prior concurrence."  *Id.*

Plaintiffs argue that Lindauer was "misled" by Inghram's email that contained "misinformation" about EPA's objection. *See Plaintiffs Reply Brief (Dkt. No. 43)* at p. 3. The Court disagrees.  The EPA's comment letter shows clearly that the EPA had no objection to the project as a whole and only objected to the E-2 alternative, just as Inghram related.  He also accurately identified the proper category of EPA's objection. There was no misinformation or misleading statements.

There remains, however, the issue whether under the agency's own Guidance, concurrence should have occurred.  The Guidance, quoted above, states that concurrence should be considered when there is an issue over a "failure to resolve issues involving Federal environmental responsibilities [or] major disagreements with resource agencies." The EPA letter could reasonably be interpreted as signaling a "major disagreement" over a possible "failure to resolve issues involving Federal environmental responsibilities."

**Memorandum Decision & Order – page 18**

On the other hand, the Guidance does not mandate concurrence in that event (but only notes that concurrence should be "considered"), and the entire tenor of the agency's regulation is to give District offices broad discretion in deciding whether to seek concurrence. This Court "must give substantial deference to an agency's interpretation of its own regulations because its expertise makes it well-suited to interpret the language." *Department of Health & Human Services v. Chater,* 163 F.3d 1129 (9th Cir. 1998). While this is a close question, the deference due to the agency tips the scale and directs a finding that the FHWA accurately interpreted its own regulations to not require prior concurrence in this instance. The Court therefore declines to adopt this argument of plaintiffs.

**<u>Invasive Weed Mitigation</u>**

Plaintiffs argue that the FEIS and ROD rely on invasive weed mitigation plans that, while discussed, have not been finalized. But invasive weed mitigation plans cannot be finalized under NEPA before the ROD is issued – NEPA prohibits fully designing a preferred alternative before issuing the ROD. 40 CFR § 1506.1(a); 23 CFR § 771.113(a). Accordingly, "NEPA does not require a fully developed plan that will mitigate all environmental harm before an agency can act; NEPA requires only that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fully evaluated." *Laguna Greenbelt v. U.S.,* 42 F.3d 517, 528 (9th Cir. 1994).

The FEIS and ROD contain that discussion. After a lengthy evaluation of mitigation measures in Chapter 9 of the FEIS, the ROD requires that "project-specific mitigation measures described below will be incorporated." *AR 000037.* Thus,

mitigation measures are not only discussed but also required.  Table 4 lists mitigation measures to control invasive weeds.  *AR 000040.*  The Court cannot find that NEPA was violated or that the FEIS and ROD were arbitrary in this instance.

**Predetermined Decision**

Plaintiffs argue that the State determined as far back as 2002 that it wanted the E-2 alternative, and that the environmental reviews were a charade.  NEPA requires that the environmental analysis not be "designed to rationalize a decision already made."  *Metcalf v. Daley,* 214 F.3d 1135, 1142 (9th Cir. 2000).  While the record shows that ITD clearly preferred E-2, the regulations authorize agencies to express a preference. *See Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.,* 126 F.3d 1158, 1185 (9th Cir. 1997) (agency can formulate a proposal and identify a preferred alternative before it finishes an EIS.  Predetermination, on the other hand, focuses on agency actions that irretrievably commit resources that could prejudice the selection of alternatives before a final decision.  *See* 40 C.F.R. § 1502.2(f); *Nat'l Audubon Soc'y v. Dep't of Navy,* 422 F.3d 174, 206 (4th Cir. 2005) (proper inquiry is "not whether an agency has focused on its preferred alternative, but instead whether it has gone too far in doing so, reaching the point where it actually has limited the choice of reasonable alternatives").

While the ITD preferred the E-2 alternative, the Court cannot find evidence that the result was predetermined.  Moreover, FHWA was the final decision-maker, and plaintiffs have pointed to no evidence that FHWA's decision was predetermined.  The Court therefore finds as a matter of law that the result here was predetermined in violation of NEPA.

## CONCLUSION

The Court has struggled with the issues in this case for several reasons: (1) ITD's clear preference for the E-2 alternative nearly tipped over to a predetermination; (2) the FEIS and ROD were heavy in bulk but light in quality, given the scanty analysis that barely cleared the "hard look" bar; and (3) the Court, if granted the authority to make the decision, would not have chosen the E-2 alternative.

But the Court is not the decision maker, and must instead decide if the agencies complied with NEPA, Executive Orders, and their own regulations, after granting the deference due to an agency interpreting its own regulations and relying on its own expertise. By the slimmest margin, the Court finds compliance. Accordingly, the Court will grant the defendants' motions for summary judgment and deny the plaintiff's motion for summary judgment. The Court will issue a separate Judgment as required by Rule 58(a).

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the defendants' motions for summary judgment (docket nos. 39 & 40) are GRANTED.

IT IS FURTHER ORDERED, that the plaintiff's motion for summary judgment (docket no. 34) is DENIED.



DATED: August 29, 2017

B. Lynn Winmill
Chief Judge
United States District Court